# IN THE COURT OF APPEALS OF IOWA

No. 14-0181
Filed June 10, 2015

**MARY MICHELLE STOBERL,**
　　Plaintiff-Appellant,

**vs.**

**IOWA DISTRICT COURT FOR
POLK COUNTY,**
　　Defendant-Appellee.
_____

　　Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg,

Judge.


　　A mother filed a petition for writ of certiorari claiming the district court

improperly found her in contempt of the dissolution decree.　**WRIT ANNULLED.**

　　Kodi A. Brotherson, Leslie Babich, and Ryan Babich of Babich Goldman,

P.C., Des Moines, for appellant.

　　Elizabeth Kellner-Nelson of Kellner-Nelson Law Firm, P.C., West Des

Moines, for appellee.

　　Considered by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**TABOR, J.**

Mary (Belle) Stoberl appeals the district court's order finding her guilty of fifteen counts of contempt for failing to comply with the decree dissolving her marriage to Joseph Stoberl. Specifically, the court found she did not follow the visitation provisions and did not allow Joseph to retrieve personal items acknowledged as his premarital property by Belle at the time of the dissolution. Because we agree she willfully disregarded the terms of the decree, we uphold the contempt findings and annul the writ.

## I.    Background Facts and Proceedings

Joseph and Belle were married in 2007 and divorced in 2012. During the marriage they had three sons: twins J.S. and C.S., born in 2009, and E.S., born in 2011. The decree granted the parents joint legal custody of the children and placed physical care with Belle. The decree ordered Joseph to have visitation on alternating weekends and every Wednesday night, as well as alternating holidays.

On the issue of property, the decree stated: "There are several items of personal property discussed by the parties but which they agree were either premarital property or gifted property. The court does not take the time to discuss these items because they do not factor into the property distribution calculation." The decree awarded each party "all other personal property not otherwise specifically mentioned in this Decree, of any manner or description whatsoever . . . which is currently in that party's possession or which is held in that party's name, free and clear of any claim of the other."

The parties later sought clarification on the issue of the personal property. The district court ruled that it had accepted and approved the division of the items the parties had "self-identified" as premarital property. Those items included "assorted shop and power tools," a lawn mower, and a piano belonging to Joseph.

After the divorce, the parents' relationship remained contentious. The tensions came to a head in March 2013 when the couple's youngest child, E.S., fell ill. Belle took E.S. to the emergency room before the children's visitation with Joseph on March 22. The doctor believed E.S. had a virus and sent him home. On March 25, when E.S. returned from visitation with Joseph, Belle believed the child's condition had worsened, and she again sought medical treatment. The doctors admitted E.S. to Blank Children's Hospital where he was diagnosed with corona virus and influenza B. E.S. was running a high fever and had papular lesions on his body. Belle noticed one lesion on her son's forearm that looked different and pointed it out to medical personnel. Belle believed the lesion to be a cigarette burn.

The doctors brought the possibility that E.S. had been burned to the attention of the Iowa Department of Human Services (DHS), which began an investigation. Belle suspected Joseph's paramour had burned the child because she was the only person in contact with the children who smoked cigarettes.

The DHS investigation included interviews with the child's doctors. None of the doctors were certain the mark was actually a burn or that it was intentionally inflicted, though they did report the mark looked different from the

other lesions on the child. The DHS found the abuse allegation "not confirmed," and Belle asked for the case to be reopened. The DHS did reopen the case and took further evidence, but again found the allegation to be "not confirmed." The investigations uncovered no allegations of harm to the two older children.

During the DHS investigation, Belle refused to allow Joseph to have visitation with any of the three children. Belle did offer visitation on the condition Joseph's paramour would not be present. Joseph did not accept visitation under those terms. During this time, Joseph missed a total of fourteen days of visitation from late March to late April 2013. Normal visitation resumed after the DHS investigation concluded.

On May 2, 2013, Joseph filed an application for an order for rule to show cause alleging interference with his visitation for all three children. The application listed fourteen missed visitation days. The application asserted "each separate allegation, including each missed visitation time, should be counted as a separate count of contempt and the Respondent punished for each separate count." The application also alleged Belle refused to allow him "to retrieve his belongings that remain at the marital residence."

The district court held a show-cause hearing on July 31, 2013. Belle testified she denied visitation because of the alleged abuse and subsequent DHS investigation. As to the personal property, she testified: "When the decree was entered, I was told that the things that were in my possession were mine to keep and do what I want with."

The district court issued a ruling on October 9, 2013, finding Belle guilty of fifteen counts of contempt—fourteen counts for denying Joseph's visitation with the twins on fourteen days and one count for withholding Joseph's personal property. The court decided Belle was not in contempt for denying visitation with E.S. while the DHS investigation was pending. The court sentenced Belle to 450 days in jail, with all but thirty days suspended. The court ruled Belle could purge the contempt finding on visitation if she allowed Joseph fourteen days of "makeup visitation" within ninety days. The court also ruled Belle could purge the contempt as to the personal property by allowing Joseph to return to the marital home to retrieve the items in question. The court also ordered Belle to pay Joseph's attorney fees. The district court later set a hearing to determine the value of Joseph's belongings that he could no longer recover.

Belle sought a writ of certiorari, and it was granted. She now challenges the contempt findings for both denial of visitation and failure to return Joseph's property. She also challenges the award of attorney fees. Joseph asks for appellate attorney fees.

## II. Scope of Review and Burdens of Proof in Contempt Cases

An appeal from a contempt finding is limited to determining if the district court acted illegally. *In re Marriage of Stephens*, 810 N.W.2d 523, 529 (Iowa Ct. App. 2012). The contempt findings must be supported by substantial evidence. *In re Marriage of Swan*, 526 N.W.2d 320, 326-27 (Iowa 1995). Substantial evidence is evidence that could convince a rational trier of fact that the alleged contemner is guilty beyond a reasonable doubt. *Ary v. Iowa Dist. Ct.*, 735

N.W.2d 621, 624-25 (Iowa 2007). Contempt is defined as willful disobedience. *McKinley v. Iowa Dist. Ct.*, 542 N.W.2d 822, 824 (Iowa 1996). Willful disobedience means "conduct that is intentional and deliberate with a bad or evil purpose, or wanton and in disregard of the rights of others, or contrary to a known duty, or unauthorized, coupled with an unconcern whether the contemner had the right or not." *Ary*, 735 N.W.2d 621, 624 (Iowa 2007) (quoting *Lutz v. Darbyshire*, 297 N.W.2d 349, 353 (Iowa 1980), *overruled on other grounds by Phillips v. Iowa Dist. Ct.*, 380 N.W.2d 706, 707, 709 (Iowa 1986)).

The party alleging contempt, here Joseph, bears the burden to prove the alleged contemner, here Belle, had a duty to obey a court order and willfully failed to perform that duty. *See Christensen v. Iowa Dist. Court,* 578 N.W.2d 675, 678 (Iowa 1998). If Joseph shows a violation, the burden shifts to Belle to produce evidence showing the violation was not willful. *See id.* But Joseph retains the burden of proof to establish willfulness beyond a reasonable doubt because of the quasi-criminal nature of the proceedings. *See id.*

### III.    Analysis

Belle raises two issues before us. First, she argues she did not willfully violate the decree in withholding visitation. Second, she contends she was not in contempt for preventing Joseph from retrieving his personal belongings because "no court order exists" regarding the distribution of his premarital property. We will address her arguments in that order.

## A. Denial of Visitation

Belle does not dispute that the dissolution decree provided Joseph with specific days of visitation. Nor does she dispute she stopped Joseph's visitation with all three children from late March to late April 2013. Instead, Belle argues she did not act willfully because she "had valid safety concerns for the parties' three toddlers." Belle focuses on the district court's decision not to hold her in contempt for withholding visitation for E.S. while the DHS investigation was ongoing. She reasons that if she had legitimate safety concerns for that child, who was almost two years old at the time, it follows that she had legitimate safety concerns for the couple's twins, who were only three years old and suffered from developmental delays. Belle asserts if Joseph's paramour had injured E.S., she was capable of injuring J.S. and C.S.

Joseph responds that Belle presented no evidence to substantiate her claim that his paramour presented a safety risk to the children. He points out Belle had been "adamant about attempting to restrict contact between Joseph's girlfriend and the children even during the time of the dissolution action." Joseph contends, given that history, it was evident Belle's interference with his visitation was willful.

In support of their respective positions, each parent relies on an unpublished case of this court. Belle cites *Ferguson v. Iowa District Court*, No. 07-1319, 2008 WL 1884007, at *3 (Iowa Ct. App. Apr. 30, 2008), in which two members of a three-judge panel decided a father should not have been held in contempt when he refused to allow the mother, an alcoholic, to supervise their

8

child on one occasion when he received a credible report she had been drinking. The dissenting judge believed the father acted with willful disobedience in denying the mother the right to visitation under the court order.

Joseph cites *Klepper v. Iowa District Court*, No. 01-0297, 2002 WL 571629, at *1 (Iowa Ct. App. Feb. 20, 2002), in which the court upheld a contempt finding when a mother refused to comply with court-ordered visitation of two children by their father. The *Klepper* court noted the mother sincerely believed the children were in "great danger" when in their father's care; according to her evidence, there was at least one instance of physical abuse and exposure to marijuana use. But the court rejected the mother's "contention that her fear for the children's safety justified her refusal to comply with the court order." *Klepper*, 2002 WL 571629, at *1.

> We find the following analysis in *Klepper* to be persuasive:
>
> Courts are frequently presented with a claim that visitation with children by a former spouse poses a dire threat to the children's safety. Such a claim demands painstaking consideration because the fear occasionally proves to be justified. The remedy must be an application to the court to modify, not a reversal by the anxious parent. The statutes are unmistakably clear: until they establish in court that a real danger to a child exists, all parents must comply with "the maximum physical and emotional contact" between a child and the other parent. Iowa Code § 598.41.

*Id.*

In this case, Belle did not seek a court order for modification of visitation pending the outcome of the DHS investigation and the DHS had no order in place requiring the children to be kept away from Joseph or his paramour. Citing the absence of these actions, the district court rejected Belle's position that she

withheld visitation for all three children out of a valid concern for their well-being in the presence of Joseph's girlfriend. In ruling on Belle's motion to enlarge, the court found Belle's actions in withholding visitation with the twins "was done intentionally and not with the legitimate concern for their safety but rather as a means to separate [Joseph's] paramour from the children as was [her] intent for a lengthy period of time."

We find substantial evidence to support the district court's determination that Belle acted in willful disobedience of the dissolution decree when she unilaterally denied Joseph visitation with J.S. and C.S. Whether she was justified in withholding visitation with E.S. during the DHS investigation is not a question before us.

We also reject Belle's alternative argument that she should only have been found guilty of one count, not fourteen separate counts of contempt, for the missed visitation. *See Johnson v. Iowa Dist. Ct.*, 385 N.W.2d 562, 564 (Iowa 1986) (holding separate contempts under Iowa Code section 598.23(1) may be punished in a single proceeding as long as distinct acts are alleged and proven). Here, Joseph's application to show cause adequately charged fourteen counts of contempt for the separate visitation dates missed.

### B. Distribution of Personal Property

On the issue of property distribution, Belle claims she was "unaware of any legal duty to give additional personal property to Joseph after the parties' decree was filed." She testified she believed the personal property in her possession after the decree was final was hers to keep.

The district court decided the evidence proved beyond a reasonable doubt that Belle knew following issuance of the decree, and the court's order clarifying the decree, that she had premarital property belonging to Joseph in her possession, yet willfully retained, sold, or otherwise disposed of that property, including his piano, in violation of the court orders.

We find substantial evidence in the record supports the district court's decision. Belle sold Joseph's piano for $150 on Craigslist and disposed of other personal property belonging to Joseph after the dissolution court issued its clarification ruling in January 2013, despite the fact that order confirmed the division of the premarital property that the parties agreed to at the time of the dissolution proceeding. We affirm the contempt finding involving the personal property.

### C.  Attorney Fees

Finally, the award of attorney fees is discretionary with the trial court. *McKinley*, 542 N.W.2d at 827. Belle argues the district court erred in ordering her to pay Joseph's attorney fees. Iowa Code section 598.24 (2013) allows for the imposition of attorney fees and costs for contempt where the grounds for the contempt relate to a violation of the decree.[1] Because we uphold the contempt

---

[1] The section reads:

> When an action for a modification, order to show cause, or contempt of a dissolution, annulment, or separate maintenance decree is brought on the grounds that a party to the decree is in default or contempt of the decree, and the court determines that the party is in default or contempt of the decree, the costs of the proceeding, including reasonable attorney's fees, may be taxed against that party.

Iowa Code § 598.24.

finding, we find the district court acted within its discretion in ordering Belle to pay attorney fees in the contempt action.

Joseph requests appellate attorney fees in the amount of $3000. Appellate attorney fees are within this court's discretion. *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). We consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *See In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993). In our discretion, considering the disparity in incomes between the parents, we decline to award appellate attorney fees.

**WRIT ANNULLED.**